UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GREEN HAVEN PRISON PREPARATIVE
MEETING OF THE RELIGIOUS SOCIETY
OF FRIENDS, *et al.*,

$\qquad$ Plaintiffs,

v.

NEW YORK STATE DEPARTMENT OF
CORRECTIONS AND COMMUNITY
SUPERVISION, *et al.*,

$\qquad$ Defendants.

No. 18-CV-8497 (KMK)

OPINION & ORDER

Appearances:

Michael Ellenberg, Esq.
Ellenberg Gannan Henninger Fitzmaurice LLP
New York, NY
*Counsel for Plaintiffs*

Frederick R. Dettmer, Esq.
Law Office of Frederick R. Dettmer
New Rochelle, NY
*Counsel for Plaintiffs*

Steven Schulman, Esq.
Office of the New York State Attorney General
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

The Green Haven Prison Preparative Meeting of the Religious Society of Friends ("Green

Haven Meeting"), Yohannes Johnson ("Johnson"), Gregory Thompson ("Thompson"), Nine

Partners Quarterly Meeting of the Religious Society of Friends ("Nine Partners Quarterly

Meeting"), Donald Badgley ("Badgley"), Emily Boardman ("Boardman"), Bulls Head-Oswego

Monthly Meeting ("Bulls Head Meeting"), Carole Yvonne New ("New"), David Leif Anderson ("Anderson"), Poughkeepsie Monthly Meeting ("Poughkeepsie Meeting"), Frederick Doneit, Sr. ("Doneit"), Julia Giordano ("Giordano"), Margaret Seely ("Seely"), Solange Muller ("Muller"), and the New York Yearly Meeting of the Religious Society of Friends, Inc. ("New York Yearly Meeting"; collectively, "Plaintiffs") bring this action against the New York State Department of Corrections and Community Supervision ("DOCCS"), Acting Commissioner of DOCCS Anthony Annucci ("Annucci"), Deputy Commissioner for Program Services of DOCCS Jeff McKoy ("McKoy"), Director of Ministerial, Family, and Volunteer Services Alicia Smith-Roberts ("Smith-Roberts"), Superintendent of Green Haven Correctional Facility ("Green Haven") Jamie LaManna ("LaManna"), Deputy Superintendent of Programs at Green Haven Jaifa Collado ("Collado"), and Deputy Superintendent of Program Services at Green Haven Marlyn Kopp ("Kopp"; collectively, "Defendants") for alleged violations of Plaintiffs' rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc, et seq.; violations of the First Amendment's Free Exercise, Free Speech, and Establishment clauses and the Fourteenth Amendment's Equal Protection clause, as made actionable by 42 U.S.C. § 1983; Article I, § 3 of the New York State Constitution; and New York Correction Law § 610, via restrictions imposed on communal religious practices of members of the Religious Society of Friends at Green Haven. (*See generally* Compl. (Dkt. No. 4).) Before the Court is Defendants' Motion To Dismiss and for Summary Judgment on Exhaustion Grounds (the "Motion"). (*See* Not. of Mot. (Dkt. No. 75).) For the foregoing reasons, the Motion is granted.

## I.  Background

### A.  Materials Considered

As a threshold matter, the Court determines the proper treatment of materials submitted on the instant Motion.  Defendants here move both to dismiss the Complaint for failure to state a claim under Rule 12(b)(6) and for summary judgment based on Plaintiffs' alleged failure to exhaust under Rule 56.  (*See* Defs.' Mem. of Law in Supp. of Mot. (Dkt. No. 77).)  "In deciding a Rule 12(b)(6) motion, the [C]ourt may consider 'only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and matters of which judicial notice may be taken."  *Hu v. City of New York*, 927 F.3d 81, 88 (2d Cir. 2019) (alteration omitted) (quoting *Saimels v. Air Trans. Local 504*, 992 F.2d 12, 15 (2d Cir. 1993)).  By contrast, in deciding a Rule 56 motion, the Court may consider any record evidence that would be admissible at trial.  *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998).  Thus, the Court must take two separate approaches in deciding the matters subject to Defendants' Rule 12(b)(6) motion versus the matter subject to Defendants' Rule 56 motion.  In considering whether Plaintiffs have plausibly stated claims for relief, the Court has considered only the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and matters of which judicial notice may be taken.  In considering whether there is a genuine issue of material fact as to exhaustion of administrative remedies, the Court has considered the admissible evidence submitted by the Parties. [1]

---

[1] The Court notes that Defendants' Motion for Summary Judgment on exhaustion grounds has not been preceded by any discovery.  (*See generally* Dkt.)  While Plaintiffs seem to take issue with this procedural posture, (*see, e.g.*, Pls.' Mem. of Law in Opp'n to Mot. 28 ("At a minimum, [P]laintiffs have presented sufficient reason to deny [D]efendants' summary judgment motion at least until relevant discovery has been concluded.") (Dkt. No. 91)), Plaintiffs have not filed a request for additional discovery under Rule 56(d), despite being on notice of Defendants' intent to file the instant Motion since at least October 2019, (*see* Hr'g Tr. 73:6–8 (Dkt. No. 84)).  As such, to the extent Plaintiffs request additional discovery before the Court resolves the instant

Defendants attach several exhibits to their Motion, which they argue are incorporated by reference in the Complaint for purposes of their Motion To Dismiss: (1) DOCCS Directive No. 4202, (*see* Decl. of Steven N. Schulman ("Schulman Decl") (Dkt. No. 79) Ex. A (Dkt. No. 79-1)); (2) DOCCS Directive No. 4022, (*see* Schulman Decl. Ex. B (Dkt. No. 79-2)); and (3) a memorandum written by Kopp and dated July 10, 2018, (*see* Schulman Decl. Ex. C (Dkt. No. 79-3)). "Generally, a court may incorporate documents referenced where (1) [the] plaintiff relies on the materials in framing the complaint, (2) the complaint clearly and substantially references the documents, and (3) the document's authenticity or accuracy is undisputed." *Stewart v. Riviana Foods Inc.*, No. 16-CV-6157, 2017 WL 4045952, at *6 (S.D.N.Y. Sept. 11, 2017) (emphasis omitted) (collecting cases); *see also Dunkelberger v. Dunkelberger*, No. 14-CV-3877, 2015 WL 5730605, at *5 (S.D.N.Y. Sept. 30, 2015) ("To be incorporated by reference, the complaint must make a clear, definite, and substantial reference to the documents, and to be integral to a complaint, the plaintiff must have (1) actual notice of the extraneous information and (2) relied upon the documents in framing the complaint." (alterations omitted) (quoting *Bill Diodato Photography LLC v. Avon Prods., Inc.*, No. 12-CV-847, 2012 WL 4335164, at *3 (S.D.N.Y. Sept. 21, 2012))). Plaintiffs clearly relied on all three documents in framing the Complaint and all three documents are clearly and substantially referenced in the Complaint. (*See* Compl. ¶¶ 50–64, 106.) Moreover, Plaintiffs do not appear to object to the incorporation of these documents in the Complaint. (*See* Pls.' Mem. of Law in Opp'n to Mot. 16 (arguing that these three documents in addition to a set of additional documents were

---

Motion, their request is denied. *See 1077 Madison St., LLC v. Daniels*, 954 F.3d 460, 464 (2d Cir. 2020) (explaining that "[t]he failure [to file an affidavit under Rule 56(d)] 'is itself grounds to reject a claim that the opportunity for discovery was inadequate'" (quoting *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137 (2d Cir. 1994))).

incorporated in the Complaint by reference) (Dkt. No. 91).)  As such, the Court will consider these documents in ruling on the matters subject to Defendants' Motion To Dismiss—and, for that matter, in ruling on the matter subject to Defendants' Motion for Summary judgment where the documents are relevant and admissible.

Plaintiffs appear to argue that a number of other documents were also incorporated by reference in the Complaint for purposes of Defendants' Motion To Dismiss, (*see id.*), including: (1) a compilation of communications between Green Haven Meeting and certain Defendants regarding the alleged termination of Green Haven Meeting's Meetings for Worship With a Concern for Business, (*see* Aff. of Frederick R. Dettmer in Opp'n to Mot. ("Dettmer Aff.") (Dkt. No. 90) Ex. 1 (Dkt. No. 90-1)); (2) a memorandum written by Plaintiffs' counsel to a DOCCS official, Reverend Alfred Twyman ("Twyman"), and dated April 10, 2018, (*see* Dettmer Aff. Ex. 2 (Dkt. No. 90-2)); (3) an email chain between Plaintiffs' counsel, Twyman, and other DOCCS officials, (*see* Dettmer Aff. Ex. 3 (Dkt. No. 90-3)); (4) a memorandum written by Kopp to Johnson (on behalf of Green Haven Meeting) and dated February 5, 2020, (*see* Dettmer Aff. Ex. 4 (Dkt. No. 90-4)); (5) a memorandum written by Johnson (on behalf of Green Haven Meeting) to Kopp and dated April 1, 2020, (*see* Dettmer Aff. Ex. 5 (Dkt. No. 90-5)); (6) a memorandum written by Kopp to Johnson (on behalf of Green Haven Meeting) and dated April 16, 2020, (*see* Dettmer Aff. Ex. 6 (Dkt. No. 90-6)); and (7) a copy of the Green Haven 2015 Special Events Calendar, (*see* Dettmer Aff. Ex. 7 (Dkt. No. 90-7)).  None of these documents is specifically referenced in the Complaint, as such, it is axiomatic that none of these documents is incorporated by referenced into the Complaint.[2]  (*See generally* Compl.)  *See also*

_____

[2] It is possible that the email chain between Plaintiffs' counsel, Twyman, and other DOCCS officials constitutes the "final effort to engage DOCCS officials' attention" vaguely referenced in paragraph 102 of the Complaint.  (Compl. ¶ 102.)  However, this single reference is

*Hutson v. Notorious B.I.G., LLC*, No. 14-CV-2307, 2015 WL 9450623, at *3 (S.D.N.Y. Dec. 22, 2015) (declining to consider documents on a motion to dismiss as incorporated by reference where "they are not referenced in the [complaint]"). As such, the Court will not consider these documents in ruling on the matters subject to Defendants' Motion To Dismiss, though the Court will consider these documents to the extent relevant to the matter subject to Defendants' Motion for Summary Judgment, where the documents are admissible.

### B.  Factual Background

As noted above, the only matter subject to Defendants' Motion for Summary Judgment is exhaustion. Therefore, the following facts which pertain to all matters except exhaustion are drawn from the Complaint and assumed to be true for the purposes of resolving the instant Motion To Dismiss. *See Div. 1181 Amalgamated Transit Union-N.Y. Emps. Pension Fund v. N.Y.C. Dep't of Educ.*, 9 F.4th 91, 94 (2d Cir. 2021) (per curiam). Where relevant, the Court also recounts facts from the various other materials the Court has ruled it may consider in deciding Defendants' Motion To Dismiss.

The following facts which pertain to exhaustion are taken from the Parties' statements pursuant to Local Rule 56.1, (*see* Defs.' Rule 56.1 Statement ("Defs.' 56.1") (Dkt. No. 76); Pls.' Rule 56.1 Counter-Statement ("Pls.' Counter 56.1") (Dkt. No. 92)), and the admissible evidence submitted by the Parties. These facts are recounted "in the light most favorable to" Plaintiffs, the non-movants. *Torcivia v. Suffolk County*, 17 F.4th 342, 354 (2d Cir. 2021). The facts regarding exhaustion as described below are in dispute only to the extent indicated.[3]

---

insufficient to incorporate the document by reference in the Complaint. *Cf. Cosmas v. Hassett*, 886 F.2d 8, 14 (2d Cir. 1989) (explaining that even "limited *quotation* does not constitute incorporation by reference" (emphasis added) (alteration omitted)).

[3] Where the Parties "identify disputed facts but with semantic objections only or by asserting irrelevant facts, . . . which do not actually challenge the factual substance described in

1.  Background of the Religious Society of Friends & Plaintiffs

Plaintiffs here are a group of individuals and associations that are part of the Religious Society of Friends, also known as Quakers (hereinafter, "Friends" or "Quakers"). (*See* Compl. ¶ 1.) The Religious Society of Friends was founded in England in the 1600s based on a belief that principles of community and equality should animate the practice of Christianity. (*See id.* ¶ 29.) It is due to these beliefs that Friends have historically rejected the role of a formal clergy, instead embracing the notion that any individual can access God. (*See id.* ¶¶ 30–33.) As such, Friends commune and worship via assemblies known as "meetings," which refer both to what other faiths might term "congregations" and to what other faiths might term "services." (*See, e.g.*, *id.* ¶ 2.) Friends in the same geographic area who congregate together regularly are known as a "Monthly Meeting." (*See id.* ¶ 39.) Monthly Meetings involve both Meetings for Worship in a more traditional sense and "Meetings for Worship With a Concern for Business," by which the Friends who make up a Monthly Meeting congregate to address organizational needs and issues. (*See id.* ¶¶ 34–38.) Four times per year, the Monthly Meetings within a larger

the relevant paragraphs, the Court will not consider them as creating disputes of fact." *New Jersey v. N.Y.C. Dep't of Educ.*, No. 18-CV-6173, 2021 WL 965323, at *2 n.1 (S.D.N.Y. Mar. 15, 2021); *see also Nimkoff v. Drabinsky*, No. 17-CV-4458, 2021 WL 4480627, at *1 n.2 (E.D.N.Y. Sept. 30, 2021) ("[T]o the extent a party's Rule 56.1 statement improperly interjects arguments and/or immaterial facts in response to facts asserted by the opposing party without specifically controverting those facts [with admissible evidence], the [c]ourt has disregarded the statement." (quotation marks and alterations omitted)); *Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) ("Many of [the] [p]laintiff's purported denials—and a number of [the plaintiff's] admissions—improperly interject arguments and/or immaterial facts in response to facts asserted by [the] [d]efendant[], often speaking past [the] [d]efendant['s] asserted facts without specifically controverting those same facts. . . . [A] number of [the] [p]laintiff's purported denials quibble with [the] [d]efendant['s] phraseology, but do not address the factual substance asserted by [the] [d]efendant[].").

Where possible, the Court has relied on the undisputed facts in the Parties' 56.1 submissions. However, direct citations to the record have also been used where relevant facts were not included in any of the Parties' Rule 56.1 submissions, or where the Parties did not accurately characterize the record.

geographic area—such as a county or a group of counties—gather "to worship and counsel together and conduct business of common interest and concern." (*Id.* ¶ 39.) These larger gatherings are known as "Quarterly Meetings." (*See id.*) Quarterly Meetings within an even larger geographic area then gather once per year in what is known as a "Yearly Meeting" to share learning and insight. (*See id.* ¶ 42.)

Green Haven Meeting is a Monthly Meeting of Friends who are incarcerated at Green Haven, including Johnson and Thompson (together with Green Haven Meeting, the "Incarcerated Plaintiffs"). (*See id.* ¶¶ 5–7, 44.) Green Haven Meeting was founded in 1976 and currently includes 8 inmates, though as many as 10–13 inmates attend meetings on some occasions. (*See id.* ¶¶ 44–45.) Up until July 2018, Green Haven Meeting met three times per week: Friday evenings for two hours for Meetings for Worship, Thursday evenings for two hours for a book club, and Saturdays for an hour and a half for Meetings for Worship With a Concern for Business. (*See id.* ¶ 46.) In addition, Friends from Nine Partners Quarterly Meeting came into Green Haven once per year for full-day gatherings, which typically included worship, business, fellowship, and a lunch paid for by the visiting Friends; these meetings came to be known as Quarterly Meetings.[4] (*See id.* ¶ 47.)

---

[4] Nine Partners Quarterly Meeting includes, inter alia, Bulls Head Meeting, Green Haven Meeting, and Poughkeepsie Meeting. (*See* Compl. ¶ 8.) Nine Partners Quarterly Meeting and its constituent Monthly Meetings are part of New York Yearly Meeting. (*See id.* ¶ 19.) Badgley and Boardman are co-clerks of Nine Partners Quarterly Meeting. (*See id.* ¶¶ 9–10.) New, Anderson, Giordano, Seely, and Muller are members of Bulls Head Meeting. (*See id.* ¶¶ 12, 13, 16, 17, 18.) Doneit is a member of Poughkeepsie Meeting. (*See id.* ¶ 15.)

The Court hereinafter refers to Nine Partners Quarterly Meeting, Bulls Head Meeting, Poughkeepsie Meeting, New York Yearly Meeting, Badgley, Boardman, New, Anderson, Doneit, Giordano, Seely, and Muller collectively as the "Non-Incarcerated Plaintiffs."

### 2.  DOCCS Directive No. 4202

DOCCS has several policies and procedures, including Directive No. 4202, which are designed to, inter alia, "ensur[e] that all religious programs and practices are carried out in accordance with the established tenets and practices of the faiths, the United States Constitution, [and] the policies and procedures of DOCCS."  (*Id.* ¶ 51; *see also* Schulman Decl. Ex. A, at § I.) As relevant to the instant Motion, DOCCS Directive No. 4202 provides that an inmate must register his or her religious affiliation with his or her facility, and may only change his or her religious affiliation once every 12 months.  (*See* Schulman Decl. Ex. A, at § VIII.)  However, while "[o]rdinarily an inmate may attend only the religious programs of his or her designated religion as noted in facility records," "it is acceptable for those who desire to learn more about the religious practices of another faith to request permission to attend up to three classes/services per year from the Chaplain of that faith group."  (*Id.* at § VI.B.3; *see also* Compl. ¶ 57.)[5]  The policy also notes that "[p]articipation by an inmate in any religious celebration, service, or study group is voluntary," and explains that "it is the responsibility of the inmate to request to participate in all religious activities of interest" and that if an inmate no longer has interest in participating in religious programming, that inmate may choose to stop attending.  (Schulman Decl. Ex. A, at § VI.B.4.)

The policy also provides that each year, DOCCS officials must prepare and distribute an annual "Religious Holy Day Calendar," which is in effect in all DOCCS facilities.  (*See* Compl. ¶ 65.)  Each "faith group" can hold only "one designated family event" per year, which enables civilians to join inmates of their faith for joint worship, celebration, and fellowship.  (*See id.* ¶¶ 66–67 (emphasis omitted).)

---

[5] Plaintiffs refer to this provision of DOCCS Directive No. 4202 as the "Three Times Rule."  (Compl. ¶ 57.)  For simplicity, the Court will adopt the same convention herein.

### 3.  Alleged Limitations on Plaintiffs' Religious Practice

Plaintiffs allege several limitations on their religious practice imposed by Defendants.

### a.  Termination of Quarterly Meetings

DOCCS's Religious Holy Day Calendar identifies Friends as "Protestant," alongside 19 other faith groups, and assigns Pentecost as the "Family Day Event" for all faiths designated as Protestant.  (*See id.* ¶¶ 68–70.)  However, Friends do not celebrate Pentecost or, historically, any other religious holidays.  (*See id.* ¶ 71.)

As such, in 2012, Green Haven Meeting—via its then-member Thaddeus Davis ("Davis")—requested that DOCCS add Quarterly Meetings to the Religious Holy Day Calendar for Friends.  (*See id.* ¶ 77.)  In response to Davis' request, then-Director of Ministerial, Family, and Volunteer Services Cheryl Morris ("Morris") advised Davis that any religious requests should be directed to the Green Haven chaplain; Quarterly Meetings were not added to the Religious Holy Day Calendar and Friends continued to be designated as Protestant and assigned Pentecost as their "Family Day Event."  (*See id.* ¶¶ 78–79.)  In 2013, Davis brought his request to McKoy, the Deputy Commissioner for Program Services, who declined Davis' request on November 22, 2013, based on information provided by "Quaker religious authorities."  (*See id.* ¶¶ 80–83.)  Like Morris, McKoy also advised Davis that any religious requests should be first directed to the Green Haven chaplain and then Green Haven's Deputy Superintendent for Program Services.  (*See id.* ¶ 88.)

As such, in 2015, Davis reiterated his request for Quarterly Meetings to be added to the Religious Holy Day Calendar to Wayne Carroll, the "RPL II/Special Subjects Supervisor" for Green Haven, and Green Haven's Protestant Chaplain.  (*See id.* ¶ 90.)  On December 16, 2014, Davis received a response from Collado, Green Haven's Deputy Superintendent for Programs, who asked for additional information.  (*See id.* ¶ 91.)  Davis provided the requested information,

and on February 2, 2015, Collado denied Davis' request, explaining: "As indicated in a letter to you from [McKoy], it is not possible to implement all the religious practices within the facilities that are practiced in outside faith communities due to security concerns, institutional safety[,] and logistical considerations at this facility." (*Id.* ¶ 92.)  Plaintiffs allege that as a result, "Green Haven Meeting was not permitted to host, and Friends throughout Nine Partners Quarter[ly] [Meeting] (and New York Yearly Meeting) were not permitted to participate in[] [Q]uarterly [M]eetings in Green Haven [] in 2015." (*Id.* ¶ 93.)

The general secretary of New York Yearly Meeting then wrote to Annucci, the Acting Commissioner of DOCCS, to address, inter alia, the termination of Quarterly Meetings at Green Haven.  (*See id.* ¶ 94.)  Annucci responded by arranging a meeting held on May 11, 2015 between Friends leaders and DOCCS leadership, at which DOCCS leadership allegedly "promised to investigate and get back to Friends, but did not do so." (*Id.* ¶ 95.)  After additional correspondence, Morris notified New York Yearly Meeting that the Friends' request for inclusion of Quarterly Meetings in DOCCS's Religious Holy Days Calendar was rejected; Morris instead instructed the Friends to direct their request to the executive staff at each facility. (*See id.* ¶¶ 96–97.)  Plaintiffs allege that thereafter, Green Haven Meeting has submitted requests to Green Haven officials each year to resume Quarterly Meetings, which has been rejected each year on the basis that the Religious Holy Day Calendar authorizes Friends to participate only in the Pentecost Family Day Event.  (*See id.* ¶¶ 98–99.)  Plaintiffs allege that "[i]n in the Spring of 2018, a final effort to engage DOCCS officials' attention was made through the Coordinating Chaplain with responsibility for Green Haven," but that "[n]o positive response was forthcoming," despite the fact that "[u]pon information and belief, DOCCS permits other

similarly situated faith groups to hold events which are the equivalent of [Q]uarterly [M]eetings" and "to hold multiple family day events, or the equivalent, per year." (*Id.* ¶¶ 102–04.)

### b.  Termination of Meetings for Worship With a Concern for Business

On July 10, 2018, Kopp—Green Haven's Deputy Superintendent for Program Services— terminated Green Haven Meeting's weekly Meeting for Worship With a Concern for Business. (*See id.* ¶ 106.)  Kopp explained that "[t]he Quakers, just like any other religion, are already approved to have worship services and study classes" and "have Friday Worship and Thursday Book study," and as such, concluded that because "[t]he Saturday call-out does not appear to be a study group or a worship service," it "does not appear necessary." (Schulman Decl. Ex. C.) She further explained that "[w]ith a congregation of a total of 8 inmates, having a Thursday study group and Friday worship service appears to be sufficient," particularly because, "[b]ased on Directive #4022, . . . [Friends] should be approved to meet twice a month" but "are actually permitted to meet weekly." (*Id.*)

### 4.  DOCCS's Grievance Process

New York state has a three-step grievance process for inmates in DOCCS facilities. (*See* Defs.' 56.1 ¶ 2; Pls.' Counter 56.1 ¶ 2.)  First, an inmate must file a complaint with the facility's grievance clerk and participate in a hearing held by the facility's Inmate Grievance Resolution Committee ("IGRC"). (*See* Defs.' 56.1 ¶ 2; Pls.' Counter 56.1 ¶ 2.)  Second, if the inmate's grievance is not favorably resolved by the IGRC, the inmate must appeal the IGRC's decision to the facility superintendent. (*See* Defs.' 56.1 ¶ 2; Pls.' Counter 56.1 ¶ 2.)  Third, if the inmate's appeal to the facility superintendent is unsuccessful, the inmate must appeal to the DOCCS Central Office Review Committee ("CORC") in Albany. (*See* Defs.' 56.1 ¶ 2; Pls.' Counter 56.1 ¶ 2.)

Per the terms of DOCCS Directive No. 4040, which governs the grievance process, inmates are permitted to file grievances complaining about "the substance or application of any written or unwritten policy" or lack thereof, and inmates may and do pursue grievances complaining about DOCCS's policies pertaining to religious programming.  (Defs.' 56.1 ¶¶ 3–4.) While the policy requires that inmates be personally affected by the issues raised in their grievances and does not permit inmates to bring grievances on behalf of a class, inmates may file grievances raising issues that affect other inmates—including, for instance, grievances pertaining to DOCCS's religious policies.  (*See* Defs.' 56.1 ¶ 6.)  Finally, DOCCS Directive No. 4040 instructs inmates who are unsure about whether they may file grievances about a particular subject matter to submit their anticipated grievances, and notes that DOCCS will determine whether the matter is grievable via the grievance process.  (*See id.* ¶ 7.)

Neither Johnson, Thompson, nor any other inmate at Green Haven registered as a Quaker pursued a grievance pertaining to DOCCS's conduct vis-à-vis Green Haven Meeting prior to the initiation of the instant Action.  (*See id.* ¶ 9.)

B.  Procedural History

Plaintiffs filed the Complaint on September 19, 2018.  (*See* Compl.)  On December 21, 2018, Defendants filed a pre-motion letter in anticipation of moving to dismiss the Complaint. (*See* Dkt. No. 12.)  On December 24, 2018, Plaintiffs filed a pre-motion letter in anticipation of filing a motion for a preliminary injunction.  (*See* Dkt. No. 13.)  After receiving responses from both would-be non-movants, (*see* Dkt. Nos. 14, 15), the Court held a pre-motion conference and set a briefing schedule for Plaintiffs' motion for a preliminary injunction, (*see* Dkt. (entry for Feb. 11, 2019)).

Plaintiffs filed their Motion for a Preliminary Injunction on March 29, 2019.  (*See* Not. of Mot. for Prelim. Inj. (Dkt. No. 25); Aff. of Donald Badgley in Supp. of Mot. (Dkt. No. 27); Aff.

of Mary Foster Cadbury in Supp. of Mot. (Dkt. No. 28); Aff. of Frederick R. Dettmer in Supp. of

Mot. (Dkt. No. 29), Aff. of Frederick Doneit, Sr. in Supp. of Mot. (Dkt. No. 30); Aff. of

Yohannes Johnson in Supp. of Mot. (Dkt. No. 31); Aff. of Rachel Ruth in Supp. of Mot. (Dkt.

No. 32); Aff. of Christopher Sammond in Supp. of Mot. (Dkt. No. 33); Mem. of Law in Supp. of

Mot. (Dkt. No. 34).)  On May 30, 2019, Defendants filed their Opposition.  (*See* Decl. of Rachel

Seguin in Opp'n to Mot. (Dkt. No. 42); Decl. of Jaifa Collado in Opp'n to Mot. (Dkt. No. 43);

Decl. of Marlyn Kopp in Opp'n to Mot. (Dkt. No. 44); Decl. of Nancy Fernandez in Opp'n to

Mot. (Dkt. No. 45); Mem. of Law in Opp'n to Mot. (Dkt. No. 46).)  On July 12, 2019, Plaintiffs

filed their Reply and simultaneously sought leave to file excess pages.  (*See* Mot. for Leave to

File Excess Pages (Dkt. No. 49); Reply Aff. of Donald Badgley in Supp. of Mot. (Dkt. No. 50);

Reply Aff. of Frederick Dettmer in Supp. of Mot. (Dkt. No. 51); Reply Aff. of Yohannes

Johnson in Supp. of Mot. (Dkt. No. 52); Reply Mem. of Law in Supp. of Mot. (Dkt. No. 53).)

On July 16, 2019, the Court allowed Plaintiffs a more modest page extension than Plaintiffs

requested, (Dkt. No. 54), and accordingly, Plaintiffs filed an Amended Reply Memorandum of

Law on July 19, 2019, (*see* Am. Reply Mem. of Law in Supp. of Mot. (Dkt. No. 56)).  On

October 4, 2019, the Court scheduled oral argument on Plaintiffs' Motion for a Preliminary

Injunction, (Dkt. No. 58); oral argument was held on October 30, 2019, (*see* Dkt. (minute entry

for Oct. 30, 2019)), and the Court denied Plaintiffs' Motion for a Preliminary Injunction, (*see*

Order (Dkt. No. 61); *see also* Hr'g Tr. (Dkt. No. 84)).

Plaintiffs filed a Motion for Reconsideration of the Court's denial of Plaintiffs' Motion

for a Preliminary Injunction on November 13, 2019.  (*See* Not. of Mot. for Recons. (Dkt.

No. 62); Mem. of Law in Supp. of Mot. for Recons. (Dkt. No. 63).)  Defendants filed their

Opposition to Plaintiffs' Motion for Reconsideration on November 26, 2019, (*see* Mem. of Law

in Opp'n to Mot. for Recons. (Dkt. No. 67)), and on December 3, 2019, the Court denied

Plaintiffs' Motion for Reconsideration, (*see* Order (Dkt. No. 68)).  On January 2, 2020, Plaintiffs

appealed the Court's denial of their Motion for Reconsideration to the Second Circuit.  (*See* Not.

of Interlocutory Appeal (Dkt. No. 70).)

Meanwhile, on November 15, 2019, Defendants filed another pre-motion letter in

anticipation of filing a motion to dismiss.  (*See* Dkt. No. 64.)  After receiving Plaintiffs'

response, (*see* Dkt. No. 65), the Court set a briefing schedule, (*see* Dkt. No. 66).  On January 27,

2020, Defendants filed their Motion To Dismiss and for Summary Judgment on Exhaustion.

(*See* Not. of Mot.; Defs.' 56.1; Defs.' Mem. of Law in Supp. of Mot. ("Defs.' Mem.") (Dkt.

No. 77); Decl. of Rachel Seguin in Supp. of Mot. ("Seguin Decl.") (Dkt. No. 78); Schulman

Decl.)  On May 7, 2020, Plaintiffs filed their Opposition.  (*See* Dettmer Aff.; Pls.' Mem. of Law

in Opp'n to Mot. ("Pls.' Mem.") (Dkt. No. 91); Pls.' Counter 56.1.)  On July 8, 2020, Defendants

filed their Reply.  (*See* Reply Mem. of Law in Supp. of Mot. ("Defs.' Reply Mem.") (Dkt.

No. 100).)

On October 18, 2021, the Second Circuit issued a decision upholding the Court's denial

of Plaintiffs' Motion for a Preliminary Injunction.  (*See* 2d Cir. Op. (Dkt. No. 101).)  Plaintiffs

have filed a petition for a writ of certiorari to the Supreme Court.  *See* Petition for Writ of

Certiorari, *Green Haven Prison Preparative Meeting of Religious Soc'y of Friends v. N.Y. State

Dep't of Corr. & Cmty. Supervision* (No. 21-1027).

## II.  Discussion

### A.  Standard of Review

As explained above, Defendants here move both to dismiss the Complaint for failure to

state a claim under Rule 12(b)(6) and for summary judgment based on Plaintiffs' alleged failure

to exhaust under Rule 56.  (*See generally* Defs.' Mem.)  As such, the standards of review under

both Rule 12(b)(6) and Rule 56 govern the disposition of the instant Motion.

      1.  Rule 12(b)(6)

      The Supreme Court has held that although a complaint "does not need detailed factual

allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his

entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)

(alteration and quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure

"demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked assertions

devoid of further factual enhancement."  *Id.* (alteration and quotation marks omitted).  Rather, a

complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative

level."  *Twombly*, 550 U.S. at 555.  Although "once a claim has been stated adequately, it may be

supported by showing any set of facts consistent with the allegations in the complaint," *id.* at

563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its

face," *id.* at 570, if a plaintiff has not "nudged [his] claim[] across the line from conceivable to

plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining

whether a complaint states a plausible claim for relief will . . . be a context-specific task that

requires the reviewing court to draw on its judicial experience and common sense.  But where

the well-pleaded facts do not permit the court to infer more than the mere possibility of

misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to

relief.'" (second alteration in original) (citation omitted) (quoting FED. R. CIV. P. 8(a)(2))); *id.* at

678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading

regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and "draw all reasonable inferences in the plaintiff's favor," *Div. 1181*, 9 F.4th at 94 (citation omitted).  Additionally, "when ruling on Rule 12(b)(6) motions to dismiss," district courts are directed to confine their consideration to "the complaint in its entirety, . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Bellin*, 6 F.4th at 473 (quotation marks omitted); *see also Dashnau v. Unilever Mfg. (US), Inc.*, 529 F. Supp. 3d 235, 240 (S.D.N.Y. Mar. 26, 2021) (same).

### 2.  Rule 56

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In deciding whether to award summary judgment, the [C]ourt must construe the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor."  *Torcivia*, 17 F.4th at 354; *see also Horror Inc. v. Miller*, 15 F.4th 232, 240 (2d Cir. 2021) (same).  "It is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Red Pocket, Inc. v. Interactive Commc'ns Int'l, Inc.*, No. 17-CV-5670, 2020 WL 838279, at *4 (S.D.N.Y. Feb. 20, 2020) (same).

"However, when the burden of proof at trial would fall on the non[-]moving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non[-]movant's claim," in which case "the non[-]moving party must

come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and quotation marks omitted). Further, "[t]o survive a [summary judgment] motion . . . , [a non-movant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading."). And, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod v. Omya*, 653 F.3d 156, 164 (2d Cir. 2011) (quotation marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva*

*Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

When ruling on a motion for summary judgment, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages*, 164 F.3d at 746. "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting FED. R. CIV. P. 56(c)(4)); *see also Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) ("Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge . . . ."); *Baity*, 51 F. Supp. 3d at 419 (disregarding "statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." (quotation marks omitted)).

### B.  Analysis

Plaintiffs allege that that by the conduct laid out above, Defendants: (1) imposed a substantial burden on Incarcerated Plaintiffs' rights under RLUIPA, (*see* Compl. ¶¶ 118–36); (2) interfered with Incarcerated Plaintiffs' rights to free exercise under the First Amendment, (*see id.* ¶¶ 137–47); (3) interfered with Non-Incarcerated Plaintiffs' rights to free exercise under the First Amendment, (*see id.* ¶¶ 148–54); (4) imposed alien religious beliefs on Incarcerated Plaintiffs in violation of the First Amendment's Establishment Clause, (*see id.* ¶¶ 155–62); (5) violated all Plaintiffs' rights to equal protection under the Fourteenth Amendment, (*see id.* ¶¶ 163–71); (6) violated all Plaintiffs' rights under the New York State Constitution, (*see id.* ¶¶ 172–76); (7) violated Incarcerated Plaintiffs' rights under New York Corrections Law § 610,

(*see id.* ¶¶ 177–81); and (8) retaliated against Incarcerated Plaintiffs' exercise of their First Amendment rights, (*see id.* ¶¶ 182–89).  For each federal claim, Plaintiffs seek injunctive relief, damages, and attorneys' fees.  (*See id.* ¶¶ 133–36, 144–47, 151–54, 159–62, 168–71, 186–89.) For each state law claim, Plaintiffs seek injunctive relief.  (*See id.* ¶¶ 175–76, 180–81.)

Defendants argue that the Complaint must be dismissed because: (1) several of Plaintiffs' claims are barred by immunities, (*see* Defs.' Mem. 7–8); (2) Non-Incarcerated Plaintiffs have failed to allege a substantial burden on their religious practice under the First Amendment via the alleged discontinuation of Quarterly Meetings, (*see id.* at 12–13); (3) Incarcerated Plaintiffs have failed to allege a substantial burden on their religious practice under either the First Amendment or RLUIPA via the cancelation of the Meetings for Worship With a Concern for Business, (*see id.* at 14–15); (4) Incarcerated Plaintiffs have failed to allege retaliation under the First Amendment via the cancelation of the Meetings for Worship With a Concern for Business, (*see id.* at 15–18); (5) the Three Times Rule and DOCCS's classification of Friends as Protestants do not violate the First Amendment or RLUIPA, (*see id.* at 18–21); (6) Incarcerated Plaintiffs have failed to allege a violation of the Establishment Clause, (*see id.* at 21–22); (7) Plaintiffs have failed to state an equal protection claim, (*see id.* at 22); and (8) Defendants are entitled to qualified immunity, (*see id.* at 22–23).  Alternatively, Defendants argue that they are entitled to summary judgment on all of Plaintiffs' claims because there is no genuine dispute that Incarcerated Plaintiffs failed to exhaust administrative remedies prior to bringing suit and Non-Incarcerated Plaintiffs' claims are derivative of Incarcerated Plaintiffs' claims.  (*See id.* at 24–30.)

The Court will address these arguments to the extent necessary to decide the instant Motion.

### 1. Federal Claims for Damages

As a preliminary matter, it is clear that Plaintiffs' federal claims for damages are subject to dismissal as precluded under the Eleventh Amendment. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. And, longstanding Supreme Court and Second Circuit precedent instructs that the Eleventh Amendment applies equally to suits brought against a state and state employees in their official capacities. *See, e.g.*, *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) ("Although by its terms the [Eleventh] Amendment applies only to suits against a State by citizens of another State, our cases have extended the Amendment's applicability to suits by citizens against their own States." (collecting cases)); *Kentucky v. Graham*, 473 U.S. 159, 169 (1985) (explaining that "absent waiver by the State or valid congressional override, the Eleventh Amendment bars a damages action against a State in federal court," a "bar [which] remains in effect when State officials are sued for damages in their official capacity"); *Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993) ("To the extent a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment belonging to the state."). Thus, "as a general rule, state governments may not be sued in federal court unless they have waived their Eleventh Amendment immunity, or unless Congress has abrogated the states' Eleventh Amendment immunity when acting pursuant to its authority under Section 5 of the Fourteenth Amendment." *Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009) (alteration and quotation marks omitted). But, "Congress did not abrogate the States' sovereign immunity when it enacted §§ 1983 and 1985, and New York has not waived its immunity." *Walker v. NYS Justice Ctr. for the Prot. of People with Special*

*Needs*, 493 F. Supp. 3d 239, 246–47 (S.D.N.Y. 2020) (collecting cases). Neither did Congress abrogate the States' sovereign immunity in enacting RLUIPA. *See Sossamon v. Texas*, 563 U.S. 277, 293 (2011) ("We conclude that States . . . do not consent to waive their sovereign immunity to private suits for money damages under RLUIPA.").

Because DOCCS "is an arm of the State of New York," Plaintiffs' § 1983 and RLUIPA claims for damages against DOCCS are barred by the Eleventh Amendment and are dismissed. *Dubarry v. Capra*, No. 21-CV-5487, 2021 WL 3604756, at *1 (S.D.N.Y. Aug. 13, 2021) (dismissing damages claims brought against DOCCS). Similarly, because Annucci, McKoy, Smith-Roberts, LaManna, Collado, and Kopp (the "Individual Defendants") are all DOCCS employees and have all been sued in their official capacities, (*see* Compl. ¶¶ 22–27), Plaintiffs' § 1983 and RLUIPA claims for damages against Individual Defendants are also barred by the Eleventh Amendment and are dismissed. *See Severino v. Negron*, 996 F.2d 1439, 1441 (2d Cir. 1993) ("[I]t is clear that the Eleventh Amendment does not permit suit[s] [under § 1983] for money damages against state officials in their official capacities."); *Gunn v. Bentivegna*, No. 20-CV-2440, 2020 WL 2571015, at *3 (S.D.N.Y. May 19, 2020) ("DOCCS officials enjoy Eleventh Amendment immunity from suit under § 1983 for damages in their official capacities.").

This holding does not extend, however, to Plaintiffs' claims for injunctive relief against Individual Defendants. The one exception to the doctrine of sovereign immunity was established by the Supreme Court in *Ex parte Young*, 209 U.S. 123 (1908), which, as the Supreme Court later explained, "held that the Eleventh Amendment does not prevent federal courts from granting prospective injunctive relief" via an injunction against a state officer "to prevent a continuing violation of federal law," *Green v. Mansour*, 474 U.S. 64, 68 (1985) (citing *Young*, 209 U.S. at 155–56, 159). The logic of the Supreme Court in *Young* was that "an

official who acts unconstitutionally is 'stripped of his official or representative character.'" *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 104 (1984). However, "if a § 1983 action alleging a constitutional claim is brought directly against a State, the Eleventh Amendment bars a federal court from granting *any* relief on that claim," *id.* at 120 (emphasis added), a prohibition that extends to state agencies, such as DOCCS, *see, e.g.*, *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993) (explaining that the *Young* exception "has no application in suits against the States and their agencies, which are barred regardless of the relief sought"); *Rivera v. Div. of Parole State*, No. 14-CV-8778, 2016 WL 297724, at *1 (S.D.N.Y. Jan. 22, 2016) ("DOCCS cannot be sued under . . . § 1983. As a general rule, the Eleventh Amendment bars lawsuits against states for money damages or injunctive relief unless the state has waived or Congress has abrogated the state's Eleventh Amendment sovereign immunity."); *Foster v. N.Y.C. Probation Dep't*, No. 11-CV-4732, 2013 WL 1342259, at *3 (E.D.N.Y. Mar. 7, 2013) (explaining that "DOCCS is a New York State entity and is thus entitled to Eleventh Amendment immunity" and recommending the dismissal of "[the] plaintiff's claims for injunctive relief against . . . DOCCS as barred by the Eleventh Amendment"), *report and recommendation adopted*, 2013 WL 1305775 (E.D.N.Y. Mar. 30, 2013).[6]

---

[6] It is unclear to the Court whether Plaintiffs intended to name Green Haven as a defendant. Green Haven is not included in the case caption, but Plaintiffs name Green Haven in the "Parties" section of the Complaint. (*See* Compl. ¶ 21.) To the extent Plaintiffs seek to bring any claims against Green Haven, these claims are dismissed for the same reason. "[DOCCS] as an arm of the state, stands in the same position as the State of New York" for purposes of sovereign immunity," and because "Green Haven is a facility operated by DOCCS, [it] is therefore in the same position." *Lyde v. Green Haven Prison*, No. 20-CV-9351, 2021 WL 431427, at *2 (S.D.N.Y. Feb. 5, 2021) (quotation marks omitted).

As such, Plaintiffs' claims for prospective injunctive relief against Individual Defendants—i.e., the reinstatement of Quarterly Meetings and Meetings for Worship With a Concern for Business, the reclassification of Friends for purposes of DOCCS's calendar, and the elimination of the Three Times Rule, (*see, e.g.*, Compl. ¶ 133)—are not barred by the Eleventh Amendment.

### 2.  Federal Claims for Injunctive Relief

#### a.  Exhaustion

Failure to exhaust is an affirmative defense, not a pleading requirement.  *See Jones v. Bock*, 549 U.S. 199, 216 (2007); *Grullon v. City of New Haven*, 720 F.3d 133, 141 (2d Cir. 2013).  Accordingly, "[i]nmates are not required to specifically plead or demonstrate exhaustion in their complaints."  *Jones*, 549 U.S. at 216.  The PLRA provides that "[n]o action shall be brought with respect to prison conditions under [§] 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  This "language is 'mandatory': An inmate 'shall' bring 'no action' (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies."  *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016) (citation omitted).  The exhaustion requirement applies to "all inmate suits about prison life."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002).  Moreover, the PLRA "requires proper exhaustion, which means using all steps that the prison grievance system holds out."  *Williams v. Priatno*, 829 F.3d 118, 122 (2d Cir. 2016) (quotation marks and alteration omitted).  Indeed, the PLRA demands "strict compliance with the grievance procedure . . . , or else dismissal must follow inexorably."  *McCoy v. Goord*, 255 F. Supp. 2d 233, 246 (S.D.N.Y. 2003) (quotation marks and alteration omitted).  As the Supreme Court has explained, "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no

adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford v. Ngo*, 548 U.S. 81, 90–91 (2006).

Despite these strict requirements, the PLRA contains a "textual exception to mandatory exhaustion," *Ross*, 136 S. Ct. at 1858. "[T]he exhaustion requirement hinges on the 'availab[ility]' of administrative remedies: An inmate . . . must exhaust available remedies, but need not exhaust unavailable ones." *Id.* (quoting 42 U.S.C. § 1997e(a)). Crucially, "available" grievance procedures are those actually "capable of use to obtain some relief for the action complained of." *Id.* at 1859 (quotation marks omitted). In *Ross*, the Supreme Court identified "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Id.* An administrative remedy is unavailable: (1) where "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) where the procedure is "so opaque that it becomes, practically speaking, incapable of use," such that "no ordinary prisoner can discern or navigate it"; or (3) where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859–60. It bears noting, however, that the "three circumstances discussed in *Ross* do not appear to be exhaustive," *Williams*, 829 F.3d at 123 n.2, but rather "guide the Court's inquiry," *Khudan v. Lee*, No. 12-CV-8147, 2016 WL 4735364, at *5 (S.D.N.Y. Sept. 8, 2016).

The DOCCS Inmate Grievance Program ("IGP") outlines the procedures that apply to grievances filed by inmates in New York state correctional facilities. As set out above—and in more detail below—the IGP provides for a three-step grievance process. (*See* Defs.' 56.1 ¶ 2; Pls.' Counter 56.1 ¶ 2; *see also* Seguin Decl. Ex. A (Dkt. No. 78-1).) *See also* N.Y. COMP. CODES R. & REGS., tit. 7, §§ 701, et seq. Under the framework used in typical cases, an inmate

must first file a complaint at the facility where the inmate is housed within 21 calendar days of an alleged occurrence. (*See* Seguin Decl. Ex. A, at § 701.5(a)(1).) Once filed, the representatives of the IGRC have up to 16 calendar days to resolve the grievance informally. (*See id.* § 701.5(b)(1).) If the matter is not satisfactorily resolved, the IGRC conducts a hearing to either answer the grievance or make a recommendation to the facility superintendent, (*see id.* § 701.5(b)(2)(i)), which is scheduled within 16 days after receipt of the grievance, (*see id.* § 701.5(b)(2)(ii)). The second step in the tripartite framework is for the grievant or any direct party to appeal the IGRC's decision to the facility superintendent within seven calendar days after receipt of the IGRC's written response, although the appealing party can seek an extension to the time limit. (*See id.* § 701.5(c)(1).) The third and final step is to appeal the superintendent's decision to the CORC, which the prisoner must do within seven days after receipt of the superintendent's written response to the grievance. (*See id.* § 701.5(d)(1)(i).) Here, too, an inmate may request an extension to the time limit. (*See id.*)

There is no genuine dispute that Incarcerated Plaintiffs did not exhaust their administrative remedies prior to bringing suit. (*See* Defs.' 56.1 ¶ 9.) However, Plaintiffs make several arguments urging the Court to excuse Incarcerated Plaintiffs' failure to exhaust. Critically, most were also presented to the Second Circuit in appealing this Court's denial of Plaintiffs' Motion for a Preliminary Injunction, *see generally Green Haven Prison Preparative Meeting of Religious Soc'y of Friends v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 16 F.4th 67 (2d Cir. 2021) ("*Green Haven*"), and the Court agrees with the Second Circuit that none is persuasive.[7]

---

[7] Plaintiffs correctly note that "[a] decision on a preliminary injunction is, in effect, only a prediction about the merits of the case . . . ; thus, findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding . . . and do not preclude

First, Plaintiffs argue that Green Haven Meeting is not subject to the PLRA's exhaustion requirement because Green Haven Meeting is not a "person . . . confined to an institution" within the meaning of the the of the PLRA, 42 U.S.C. § 1997e(a), though Green Haven Meeting *is* "a person residing in or confined to an institution" within the meaning of RLUIPA, 42 U.S.C. §§ 2000cc-1(a), 2000cc-2(a). (*See* Pls.' Mem. 25–26.) The Court agrees with the Second Circuit that "[t]he problem with Plaintiffs' attempt to avoid the PLRA's exhaustion requirement is that it attempts to whipsaw the relevant statutes (RLUIPA and the PLRA) in a manner that vitiates the PLRA's requirements." *Green Haven*, 16 F.4th at 82. Indeed, as the Court observed during the preliminary injunction hearing, by Plaintiffs' logic, "a group of prisoners can circumvent the exhaustion requirement" under any circumstances "by creating a group . . . and giving it a name" under which to sue via RLUIPA. (Hr'g Tr. 22:1–3.) Such an outcome would render the PLRA a nullity whenever matters subject to RLUIPA are involved. *See Washington v. Barr*, 925 F.3d 109, 116–17 (2d Cir. 2019) (explaining that it is a "basic canon of statutory interpretation" that "if possible, every provision of a statute . . . be given effect"). In short, this Action "brought by Green Haven Meeting is brought to vindicate the rights of its members, and those members, as prisoners, are bound by the requirements of the PLRA." *Green Haven*, 16 F.4th at 82.

Second, Plaintiffs appear to argue that the grievance process was unavailable to Incarcerated Plaintiffs because "DOCCS excludes from its grievance procedure 'a matter which affects a class of inmates' . . . [and] [t]he [I]ncarcerated Plaintiffs' claims involve matters which

_____

reexamination of the merits at a subsequent trial." (Pls.' Mem. 14 (some alterations in original) (quoting *Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 107 (2d Cir. 2012)).) To be clear, the Court does not find that it is precluded from considering Plaintiffs' arguments currently before the Court on Defendants' Motion for Summary Judgment because the Court rejected these arguments in denying Plaintiffs' Motion for a Preliminary Injunction, a ruling that was upheld by the Second Circuit. Rather, the Court stands by its previous reasoning and is persuaded by the Second Circuit's reasoning in affirming the Court's ruling, as explained herein.

affect a class of inmates." (Pls.' Mem. 26.)  Here, the Court again agrees with the Second

Circuit that the language of DOCCS Directive No. 4040, which states that individuals

"personally affected by a matter which affects a class of inmates may only file a grievance on

their own behalf," (Seguin Decl. Ex. A, at § 701.3(d)), "makes clear that an individual prisoner

may still file a grievance on his own behalf, even if other prisoners could benefit from the

outcome." *Green Haven*, 16 F.4th at 81.  This is further underscored by the fact that the

directive permits inmates to file grievances complaining about "the substance or application of

any written or unwritten *policy*," (Seguin Decl. Ex. A, at § 701.2(a) (emphasis added)), which

definitionally would apply to more than a single inmate.  "And if, under the DOCCS regulations,

[Incarcerated Plaintiffs] may [bring a grievance], then, under the PLRA, they must."  *Green*

*Haven*, 16 F.4th at 81–82.[8]

---

[8] Plaintiffs make much over the Court's observation during the preliminary injunction hearing that the unavailability of classwide grievances is made even less persuasive given that Incarcerated Plaintiffs could not bring a class claim because they are simply a "discrete number of inmates who share a claim that their [constitutional] right[s] to practice their religion . . . under the First Amendment [and] RLUIPA are being violated."  (Hr'g Tr. 66:9–13.)  Plaintiffs lodge several objections to this observation, appearing to both argue that Incarcerated Plaintiffs *could* satisfy Rule 23's numerosity requirement—because "[t]he numerosity requirement for class actions does relate to numbers, but does not require the number to be uncountable"—and that Rule 23's standards would not govern a hypothetical class grievance, and Incarcerated Plaintiffs could satisfy New York's "more liberal" class action standards.  (Pls.' Mem. 27.)

To be clear, the Court has made and continues to make no findings as to whether federal or New York class action standards would govern a hypothetical class grievance.  Rather, the Court simply observed that Incarcerated Plaintiffs could never bring a class action lawsuit as a means of demonstrating why Plaintiffs' argument that exhaustion should be excused based on the alleged unavailability of class grievances is baseless: first, DOCCS regulations allow for inmates to bring grievances that would provide relief to other inmates, and second, a hypothetical class grievance would not be necessary to vindicate Incarcerated Plaintiffs' rights given the small number of Quaker inmates.  Moreover, the Court notes that while Plaintiffs are, of course, correct that Rule 23 does not require that the proposed class be "uncountable," Rule 23 does require that the proposed class be "so numerous that joinder of all members is impracticable," FED. R. CIV. P. 23(a)(1), a standard which is "presumed" satisfied "for classes larger than *forty* members," *Pa. Public Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co., Inc.*, 772 F.3d 111, 120 (2d Cir. 2014) (emphasis added).

Third, Plaintiffs appear to argue that the grievance process was functionally unavailable as futile, because DOCCS "has a policy of not permitting inmate initiated requests for alterations of the Religious Holy Day Calendar," a policy which is not publicly disclosed.  (Pls.' Mem. 28 (citation omitted).)  Plaintiffs argue that "only in a Kafkaesq [sic] cell" would an inmate be required to either (1) file a grievance requesting an alteration of the DOCCS calendar when such a grievance would surely be unsuccessful or (2) file a grievance to challenge a policy that the inmate did not know existed.  (*Id.* at 29.)  However, as the Second Circuit explained, "[t]he bar for the availability of remedies . . . is low"; "[t]o constitute an 'available' remedy, a process requires only 'the *possibility* of some relief.'"  *Green Haven*, 16 F.4th at 82 (emphasis in original) (quoting *Ross*, 578 U.S. at 643).  And, here, "Incarcerated Plaintiffs provide no evidence that a grievance asserting that a prisoner's religious liberty has been violated by a limitation on the number or timing of religious services or celebrations could not lead to a change in the challenged prison policies."  *Id.*  Further, the Court does not agree with what appears to be Plaintiffs' premise: that the only way to resume Quarterly Meetings would be to alter the DOCCS calendar to substitute Quarterly Meetings for Pentecost as the Quaker family day event.  Incarcerated Plaintiffs could have, for instance, challenged DOCCS's policy of only permitting one designated family day event per faith group per year or sought a bespoke solution outside of the DOCCS calendar process.  Accordingly, the Court finds that the grievance process was not futile.

Fourth, Plaintiffs appear to argue that Incarcerated Plaintiffs should be deemed to have satisfied PLRA exhaustion for purposes of the instant Action (at least with respect to the alleged termination of Meetings for Worship With a Concern for Business) because Incarcerated Plaintiffs "took heed of the [C]ourt's direction in the preliminary injunction proceeding to

complete the DOCCS grievance process and have completed the process regarding the termination of [M]eetings for [W]orship [W]ith a [C]oncern for [B]usiness." (Pls.' Mem. 29.) However, as Plaintiffs, in fact, acknowledge, (*see id.* at 30), "[e]xhaustion must occur *prior to* Plaintiff[s'] filing suit; 'subsequent exhaustion after suit is filed therefore is insufficient.'" *Robinson v. Wolf-Friedman*, No. 18-CV-2409, 2019 WL 4640236, at *3 (S.D.N.Y. Sept. 24, 2019) (alteration omitted) (emphasis in original) (quoting *Neal v. Goord*, 267 F.3d 116, 122 (2d Cir. 2001)); *see also* 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under [§] 1983 . . . by a prisoner confined in any jail, prison, or other correctional facilities *until* such administrative remedies as are available are exhausted." (emphasis added)). Therefore, Plaintiffs appear to agree that even assuming arguendo that Incarcerated Plaintiffs have now fully exhausted their administrative remedies, this post-filing exhaustion does not satisfy the PLRA's requirements.

Rather, Plaintiffs argue that because Incarcerated Plaintiffs have now exhausted their administrative remedies, "dismissing the claims without prejudice and/or with leave to amend" would be a "pointless process" because Incarcerated Plaintiffs "would simply refile." (Pls.' Mem. 30.) This argument is unavailing. First, Plaintiffs cite to no authority for the proposition that a court can simply ignore a statutorily mandated procedural process based on a party's belief that the process is "pointless," nor is the Court aware of any. Second, it is possible that Plaintiffs could be barred from "simply refil[ing]" based on timeliness grounds given that "claims brought pursuant to § 1983 in New York are subject to a three-year statute of limitations," *Tenemille v. Town of Ramapo*, No. 18-CV-724, 2020 WL 5731964, at *8 (S.D.N.Y. Sept. 24, 2020) (citing *Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013)), "claim[s] brought pursuant to RLUIPA [are] governed by the four-year catch-all federal statute of limitations," *Roman Cath. Diocese of*

*Rockville Ctr. v. Incorporated Village of Old Westbury*, No. 09-CV-5195, 2011 WL 666252, at

*12 (E.D.N.Y. Feb. 14, 2011) (quotation marks omitted), and "accrual [under both statutes]

occurs when the plaintiff knows or has reason to know of the injury which is the basis of his

action," *Pearl v. City of Long Beach*, 296 F.3d 76, 80 (2d Cir. 2002) (quotation marks omitted),

*cert. denied*, 538 U.S. 922 (2003); *see also Roman Cath. Diocese of Rockville Ctr.*, 2011 WL

666252, at *12.

      Finally—and somewhat relatedly—Plaintiffs argue that Defendants have waived the

grievance process as to the Quarterly Meetings because Incarcerated Plaintiffs were told in

response to their post-filing attempt to exhaust their administrative remedies that their request for

Quarterly Meetings was being addressed via the instant Action. (*See* Pls.' Mem. 30.)  Even if

Defendants could waive the grievance process in this manner, that would not affect the Court's

finding because, as explained, post-filing exhaustion cannot satisfy the PLRA's requirement of

pre-filing exhaustion.

      Accordingly, the Court finds that there is no genuine dispute that Incarcerated Plaintiffs

did not exhaust their administrative remedies prior to bringing suit and that their failure to

exhaust cannot be excused.  As such, the Court grants summary judgment to Defendants on all

claims brought by the Incarcerated Plaintiffs.[9]

### b.  Failure to State a Claim

      The Court's holdings up to this point leave only Non-Incarcerated Plaintiffs' claims for

injunctive relief intact.  Thus, the only remaining federal claims are Non-Incarcerated Plaintiffs'

---

[9] Defendants argue that "[a]lthough the exhaustion requirement does not apply to civilian plaintiffs, the failure of [Incarcerated Plaintiffs] to exhaust requires dismissal of the [Non-Incarcerated Plaintiffs'] claims as well" because Non-Incarcerated Plaintiffs' claims are derivative of Incarcerated Plaintiffs claims. (Defs.' Mem. 29–30.)  Because the Court finds that Non-Incarcerated Plaintiffs' claims fail under Rule 12(b)(6), *see infra*, the Court need not decide this issue.

First Amendment free exercise and Fourteenth Amendment equal protection claims.  (*See*

Compl. ¶¶ 148–54, 163–71.)  Both are subject to dismissal under Rule 12(b)(6).

<u>i.  Free Exercise Claim</u>

As a preliminary matter, the Court must determine whether to apply the standards

governing free exercise claims brought by inmates versus the standards governing free exercise

claims brought by non-inmates.  *See, e.g.*, *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987)

("*Shabazz*") ("[P]rison regulations alleged to infringe on constitutional rights are judged under a

'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of

fundamental constitutional rights."); *Turner v. Safley*, 482 U.S. 78, 81 (1987) (holding that "a

lesser standard of scrutiny is appropriate in determining the constitutionality of . . . prison

rules").  Non-Incarcerated Plaintiffs are not inmates, however, as the Second Circuit explained,

by "claim[ing] a right to associate with incarcerated persons for purposes of collective worship

and religious discussion," Non-Incarcerated Plaintiffs "seek to enter the domain of the prison

itself, where security concerns are pressing."  *Green Haven*, 16 F.4th at 84.  As such, "Non-

Incarcerated [Plaintiffs] cannot claim a right to a more searching review of prison regulations

affecting religious liberty than the reasonableness standard applied to their incarcerated co-

religionists."  *Id.*  Nor, it is worth noting, do Plaintiffs appear to argue for such a more searching

review to apply to Non-Incarcerated Plaintiffs' claims.  (*See, e.g.*, Pls.' Mem. 8 (arguing that

Non-Incarcerated Plaintiffs "have constitutional rights in the prison setting, even if those rights

may be limited where the burden of justification enjoyed by prison officials is relaxed").)  The

Court will thus apply the standards governing free exercise claims brought by inmates to Non-

Incarcerated Plaintiffs' free exercise claim.

It is well-established that the First Amendment affords inmates constitutional protection

to practice their religion.  *See Shabazz*, 482 U.S. at 348 (holding that "[i]nmates clearly retain

protections afforded by the First Amendment, including its directive that no law shall prohibit

the free exercise of religion"); *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) (explaining

that "[p]risoners have long been understood to retain some measure of the constitutional

protection afforded by the First Amendment's Free Exercise Clause").  However, because of

inmates' unique circumstances, their free exercise rights are necessarily more constrained than

those of other persons.  *See Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990) ("Balanced

against the constitutional protections afforded prison inmates, including the right to free exercise

of religion, are the interests of prison officials charged with complex duties arising from

administration of the penal system." (citing *Pell v. Procunier*, 417 U.S. 817, 833 (1974))).  A

prisoner's free exercise claims are therefore "judged under a 'reasonableness' test less restrictive

than that ordinarily applied to alleged infringements of fundamental constitutional rights."  *Ford*,

352 F.3d at 588 (quoting *Farid v. Smith*, 850 F.2d 917, 925 (2d Cir. 1988)).

To state a free exercise claim, an inmate "must make a threshold showing that the

disputed conduct substantially burdened his sincerely held religious beliefs."  *Washington v.*

*Chaboty*, No. 09-CV-9199, 2015 WL 1439348, at *9 (S.D.N.Y. Mar. 30, 2015) (quotation marks

omitted); *see also Salahuddin v. Goord*, 467 F.3d 263, 274–75 (2d Cir. 2006) (same).  To state

that a belief is "sincere," the inmate "need only demonstrate that the beliefs professed are

sincerely held and in the individual's own scheme of things, religious."  *Ford*, 352 F.3d at 588

(alterations and quotation marks omitted).  To state a "substantial burden," the inmate must

allege that "the state [has] put[] substantial pressure on an adherent to modify his behavior and to

violate his beliefs."  *Rossi v. Fishcer*, No. 13-CV-3167, 2015 WL 769551, at *7 (S.D.N.Y.

Feb. 24, 2015) (quotation marks omitted).  That is, "[t]he relevant question in determining

whether [the inmate's] religious beliefs were substantially burdened is whether participation in

the [religious activity], in particular, is considered central or important to [the inmate's] religious

practice." *Ford*, 352 F.3d at 593–94. "Once [an inmate] establishes this burden, '[t]he

defendants then bear the relatively limited burden of identifying the legitimate penological

interests that justify the impinging conduct.'" *Smith v. Perlman*, No. 11-CV-20, 2012 WL

929848, at *7 (N.D.N.Y. Mar. 19, 2012) (quoting *Salahuddin*, 467 F.3d at 275). The burden

then shifts back to the inmate "to show that these articulated concerns were irrational."

*Salahuddin*, 467 F.3d at 275 (quotation marks and alteration omitted).

     Non-Incarcerated Plaintiffs' free exercise claim is limited to Defendants' alleged

termination of Quarterly Meetings. (*See* Compl. ¶¶ 149–50 ("Defendants' regulation and actions

further prevent [Non-Incarcerated Plaintiffs] from worshiping [sic] with Green Haven Meeting

Friends in [Q]uarterly [M]eetings, thereby depriving them of the ability to exercise their religion.

Defendants' imposition on and deprivations of [Non-Incarcerated Plaintiffs'] constitutional

rights are not reasonably related to legitimate penological interests.").) Defendants do not appear

to argue, (*see* Defs.' Mem. 12–13)—nor does the Court doubt—that Non-Incarcerated Plaintiffs'

religious beliefs are sincerely held. However, Defendants argue that Non-Incarcerated Plaintiffs

have failed to allege that Defendants' alleged termination of Quarterly Meetings substantially

burdened Non-Incarcerated Plaintiffs' religious beliefs. (*See id.*) The Court agrees.

     In order to plausibly allege that Non-Incarcerated Plaintiffs' religious beliefs were

substantially burdened, Plaintiffs must allege that *Non*-Incarcerated Plaintiffs' participation in

Quarterly Meetings *at Green Haven* specifically "is considered central or important to [*Non*-

Incarcerated Plaintiffs'] religious practice." *Ford*, 352 F.3d at 593–94. While the allegations in

the Complaint do state the importance of participation in Quarterly Meetings generally for both

incarcerated and non-incarcerated Friends, (*see, e.g.*, Compl. ¶¶ 39–43), and explain that

Quarterly Meetings at Green Haven attended by both incarcerated and non-incarcerated Friends "were the manner by which [Friends incarcerated at Green Haven] could participate in the discernment, testing[,] and evolution of Friends' faith and practice," (*id.* ¶ 48), the Complaint is devoid of any allegations as to the importance of participating in Quarterly Meetings held inside of prisons to the religious practice of non-incarcerated Friends, (*see generally* Compl.).  Thus, the Court ultimately agrees with Defendants that Non-Incarcerated Plaintiffs "fail to allege a substantial burden in support of their Free Exercise Clause claims because DOCCS has not restricted their ability to participate in Quarterly Meetings outside of Green Haven." (Defs.' Mem. 12.)  *Cf. Westchester Day Sch. v. Village of Mamaroneck*, 504 F.3d 338, 349 (2d Cir. 2007) (explaining that "where the denial of [a religious] institution's application to build [in a specific location] will have minimal impact on the institution's religious exercise, it does not constitute a substantial burden"); *Fortress Bible Church v. Feiner*, 734 F. Supp. 2d 409, 504 (S.D.N.Y. 2010) (explaining that the fact that a church "was prevented from building a new facility" on a specific property "does not itself establish a substantial burden under RLUIPA").[10]

Non-Incarcerated Plaintiffs appear to argue that the alleged termination of Quarterly Meetings at Green Haven imposed a substantial burden on their religious practice because Quarterly Meetings had previously been permitted, and "in constitutional analysis, history matters." (Pls.' Mem. 11 (quotation marks omitted).)  However, the Court agrees with

---

[10] *See also Holland v. Goord*, 758 F.3d 215, 224 (2d Cir. 2014) ("RLUIPA provides a more stringent standard than does the First Amendment, barring a government from imposing a substantial burden on a prisoner's free exercise unless the challenged conduct or regulation furthers a compelling governmental interest and is the least restrictive means of furthering that interest." (alterations and quotation marks omitted)); *Roman Cath. Diocese of Rockville Centre v. Incorporated Village of Old Westbury*, 128 F. Supp. 3d 566, 587 (E.D.N.Y. 2015) ("Substantial burden claims under RLUIPA are intended to mirror the framework of First Amendment free exercise claims.").

Defendants that Plaintiffs identify no authority for the proposition that a plaintiff can successfully allege that he or she has suffered a substantial burden merely because an activity that was previously permitted, and not required, was discontinued. (*See* Defs.' Reply Mem. 4.) Plaintiffs cite to *Williams v. Annucci*, 895 F.3d 180 (2d Cir. 2018), *United States v. Sec'y, Fla. Dep't of Corr.*, 828 F.3d 1341 (11th Cir. 2016), and *Monroe v. Gerbing*, No. 16-CV-2818, 2017 WL 6614625 (S.D.N.Y. Dec. 27, 2017), (*see* Pls.' Mem. 12), but as Defendants point out, none of those cases supports Plaintiffs' argument, (*see* Defs.' Reply Mem. 4). Rather, those courts found that "the fact [that] an accommodation was previously afforded is germane to the question of whether the accommodation is a burden on the prison system that previously provided it," (*id.*), for purposes of determining whether the defendant-prison official could demonstrate that the substantial burden imposed on the plaintiff-inmate was justified by a legitimate penological interest.[11] Because the Court has found that Plaintiffs have failed to allege that Non-Incarcerated Plaintiffs' religious beliefs were substantially burdened, the Court need not consider whether a

---

[11] *See Williams*, 895 F.3d at 190–92 & n.5 (finding, on summary judgment, that the defendant's substantial burden on the plaintiff's religious practice by refusing to accommodate the plaintiff's dietary restrictions was not justified by the defendant's "compelling interest in controlling costs and avoiding administrative burdens," because the defendant "ha[d] not shown . . . that accommodating [the plaintiff] would significantly increase costs and administrative burdens," and noting that "where a facility has demonstrated a capability to accommodate inmates but chooses not to, [a court is] well within bounds to consider that capability when determining how burdensome accommodating the plaintiff would actually be"); *Sec'y, Fla. Dep't of Corr.*, 828 F.3d at 1347–48 (considering, on summary judgment, the fact that the department-defendant had previously provided kosher meals statewide relevant to whether the current policy denying kosher food furthered the defendant's compelling interest in cost containment); *Monroe*, 2017 WL 6614625, at *10–11 (explaining, after finding that the plaintiff "has crossed the substantial burden threshold" via alleging that taking his medication prior to sundown during Ramadan violated his religious beliefs, that the defendants could not argue that "the change in [the] [p]laintiff's medication schedule would have any impact on the allocation of prison resources" because "he was already receiving that accommodation").

hypothetical substantial burden would have been justified by a legitimate penological interest; as such, Plaintiffs' authorities are irrelevant.

Accordingly, the Complaint fails to state a claim for violation of Non-Incarcerated Plaintiffs' First Amendment free exercise rights, and thus, this claim is dismissed.

### ii.  Equal Protection Claim

The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985); *see also Harlen Assocs. v. Incorporated Village of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) (same). "[T]o assert an equal protection claim, a plaintiff must plead (1) adverse treatment 'compared with similarly situated individuals,' and (2) 'that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Marom v. Town of Greenburgh*, No. 13-CV-4733, 2015 WL 783378, at *9 (S.D.N.Y. Feb. 23, 2015) (quoting *Miner v. Clinton County*, 541 F.3d 464, 474 (2d Cir. 2008)).  This requires a showing of "discriminatory intent or purpose." *Village of Arlington Heights v. Met. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977); *see also Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005) (holding that a plaintiff must allege "that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination" (citation omitted)); *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995) (holding that a plaintiff "must prove purposeful discrimination, directed at an identifiable or suspect class" (citing *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987) and *Kadrmas v. Dickinsin Pub. Schs.*, 487 U.S. 450, 457–58 (1988))).

Here, the Court need not determine whether the standards governing equal protection claims brought by inmates versus the standards governing equal protection claims brought by non-inmates would apply, because either way, Plaintiffs have failed to allege in a non-conclusory

fashion that any plaintiff suffered adverse treatment compared with similarly situated individuals and have wholly failed to allege discriminatory intent or purpose.  The sum total of Plaintiffs' allegations that go to Plaintiffs' equal protection claim are the following: (1) "[u]pon information and belief, DOCCS permits other similarly situated faith groups to hold events which are the equivalent of [Q]uarterly [M]eetings," (Compl. ¶¶ 103, 165); (2) "[u]pon information and belief, DOCCS permits other similarly situated faith groups to hold multiple family day events, or the equivalent, per year," (*id.* ¶ 104); and (3) "DOCCS' disparate treatment of Green Haven Friends denied Plaintiffs the equal protection of the laws," (*id.* ¶ 167).  These conclusory allegations are insufficient to state a claim for denial of equal protection.  *See, e.g.*, *Thomas v. Demeo*, No. 15-CV-9559, 2017 WL 3726759, at *11 (S.D.N.Y. Aug. 28, 2017) (dismissing equal protection claim where the complaint "provides at best conclusory allegations that [the plaintiff] was treated differently from similarly situated inmates at Otisville"); *Panzella v. City of Newburgh*, 231 F. Supp. 3d 1, 8 (S.D.N.Y. 2017) ("Well-pled facts showing that the plaintiff has been treated differently from others similarly situated, remains an essential component of [an equal protection] claim and conclusory allegations of selective treatment are insufficient to state an equal protection claim." (alterations omitted) (quoting *Bishop v. Best Buy, Co.*, No. 08-CV-8427, 2010 WL 4159566, at *11 (S.D.N.Y. Oct. 13, 2010))); *see also Freeman v. Kirisits*, 818 F. App'x 34, 41 (2d Cir. 2020) (summary order) ("To survive a motion to dismiss, a plaintiff advancing an equal protection claim must 'plausibly allege facts that provide at least minimal support for the proposition that the [defendant] was motivated by discriminatory intent.'" (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86–87 (2d Cir. 2015))).[12]

---

[12] Plaintiffs appear to argue that they have alleged adverse treatment compared to similarly situated individuals based on the fact that Green Haven's 2015 Special Events Calendar includes special events on weekends for several other faith groups.  (*See* Pls.' Mem. 3–4.)

Accordingly, the Complaint fails to state a claim for violation of Non-Incarcerated Plaintiffs' Fourteenth Amendment equal protection rights, and thus, this claim is dismissed.

### 3.  Supplemental Jurisdiction

As the Court has dismissed Plaintiffs' federal causes of action, it declines to exercise supplemental jurisdiction over Plaintiffs' state law claims.  *See Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well."); *Torres v. City of New York*, 248 F. Supp. 2d 333, 334 (S.D.N.Y. 2003) ("Where the basis for pendent jurisdiction is dismissed, ordinarily so should the state law claims be dismissed.").

## III.  Conclusion

For the foregoing reasons, the Court grants Defendants' Motion.  Because this is the first adjudication of Plaintiffs' claims subject to Defendants' Rule 12(b)(6) motion, Non-Incarcerated Plaintiffs' free exercise and equal protection claims are dismissed without prejudice.  To the extent Non-Incarcerated Plaintiffs have a good faith basis for filing an amended complaint, they must do so within 30 days of the date of this Opinion & Order.  Failure to properly and timely amend will result in dismissal of these claims with prejudice.

---

However, the Court has ruled that it cannot consider the 2015 Special Events Calendar in ruling on matters subject to Defendants' Motion To Dismiss, which would include Plaintiffs' equal protection claim.  *See supra* I.A.  And even if the Court could consider the 2015 Special Events Calendar, the bare fact that the calendar contains special events on weekends for other faith groups would not change the Court's conclusion absent—at least—specific factual allegations that those other faith groups are similarly situated to the Quakers and those faith groups' special events are analogous to Quarterly Meetings.

The Clerk of Court is respectfully directed to termination the pending Motion, (Dkt. No. 75), and enter judgment for Defendants on Incarcerated Plaintiffs' claims.

SO ORDERED.

Dated:   March 28, 2022
        White Plains, New York

_____
KENNETH M. KARAS
United States District Judge